**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**KIMBERLY LETCHWORTH GRAHAM,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:14-cv-27280**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Summary Judgment and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 8, 12).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the

1

presiding District Judge **GRANT** Plaintiff's Motion for Summary Judgment, (ECF No. 8), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   Procedural History

On July 12, 2011, Plaintiff Kimberly Letchworth Graham ("Claimant") filed applications for DIB and SSI, alleging a disability onset date of December 23, 2008, (Tr. at 197, 204), due to "severe degenerative arthritis in both knees; chronic pain; severe problems walking, standing and sitting; depression and anxiety; cry a lot any time; vertigo; obesity; memory problems; concentration; [and] focusing." (Tr. at 226). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 117-21, 123-39). Claimant filed a request for an administrative hearing, (Tr. at 142), which was held on March 7, 2013, before the Honorable Allan T. O'Sullivan, Administrative Law Judge ("ALJ"). (Tr. at 31-56). By written decision dated May 15, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 17-26). The ALJ's decision became the final decision of the Commissioner on August 29, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 6, 7). Claimant then filed a Motion for Summary Judgment with an accompanying

memorandum, (ECF Nos. 8, 9), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a reply memorandum, (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 40 years old at the time that she filed her applications for benefits, and 42 years old on the date of the ALJ's decision. (Tr. at 26, 34, 197, 204). She completed the tenth grade and communicates in English. (Tr. at 36, 225, 227). Claimant has previously worked as a clerical worker, cashier at a grocery store, customer service representative and manager at a payday advance, and inventory clerk. (Tr. at 36-38, 227, 243-47).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability

to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to

determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

5

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2014. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 23, 2008, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "morbid obesity, degenerative joint disease, and depression." (*Id.*, Finding No. 3). The ALJ considered Claimant's additional alleged impairment of vertigo; however, the ALJ found this alleged impairment to be non-severe. (*Id.*)

Under the third inquiry, the ALJ concluded that Claimant did not have any impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 19-21, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with postural and mental limitations. The claimant can stand and/or walk up to six hours in an eight-hour workday; sit up to six hours in an eight-hour workday with the ability to alternate between sitting and standing at least once an hour; lift and/or carry 10 pounds frequently and 20 pounds occasionally; and push/pull up to the weight capacity for lifting and carrying. She is unable to stoop, crawl, or squat. She is limited to performing simple, routine, repetitive tasks.

(Tr. at 21-24, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 25, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 25-26, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born

in 1970, and was defined as a younger individual on the alleged disability onset date; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 25, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 25-26, Finding No. 10), including work as a ticket taker, mail clerk, or marker at the light exertional level. (Tr. at 25-26). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus, she was not entitled to benefits. (Tr. at 26, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises four challenges to the Commissioner's decision. (ECF N0. 9 at 2). First, Claimant argues that the ALJ failed to properly weigh the medical evidence and explain his reasoning for discounting the opinions of Claimant's treating physicians, Ken Lovette, M.D., and Carol C. Bosholm, M.D.[1] (*Id.* at 11-13). With respect to Dr. Lovette, he opined that Claimant was disabled due to chronic degenerative arthritis of the knees, which he believed would require surgery. (*Id.* at 6). Claimant insists that the ALJ erred in assigning little weight to this opinion because the ALJ failed to explain what evidence contradicted Dr. Lovette's opinion, and the opinion was supported by clinical and diagnostic evidence. (*Id.* at 12). Specifically, Claimant points out that x-rays of her right knee revealed advancement of osteoarthritis and loss of joint space height. (*Id.*) Moreover, Claimant asserts that her treaters' physical examination findings often

---

[1] The ALJ referred to Dr. Bosholm as "Dr. Bolshylyn."

included lower extremity edema and right knee tenderness. (*Id.*) Claimant also indicates that she regularly treated with Dr. Lovette for her alleged knee impairments. (*Id.* at 13). With respect to Dr. Bosholm, she diagnosed Claimant with morbid obesity and osteoarthritis of the knees. (*Id.* at 6). She opined that Claimant could sit, stand, or walk for one hour in an eight-hour workday. (*Id.* at 7). Dr. Bosholm further determined that Claimant would need to get up and move every fifteen minutes, that Claimant would require fifteen-minute breaks every thirty minutes, and that Claimant's symptoms constantly interfered with her attention and concentration. (*Id.*) Claimant avers that the ALJ erred in assigning no weight to Dr. Bosholm's opinion because Dr. Bosholm regularly treated Claimant and Dr. Bosholm identified clinical findings and diagnostic testing that supported her opinion. (*Id.* at 12-13). Additionally, Claimant insists that ALJ improperly rejected all of the medical opinion evidence, which left him to "inappropriately rel[y] on his own lay impression of the evidence" in formulating Claimant's RFC. (*Id.* at 14). Moreover, although Claimant concedes that the RFC finding is reserved to the ALJ, she insists that the ALJ here failed to cite any medical or other evidence to support his RFC finding. (*Id.*)

In her second challenge, Claimant contends that the ALJ failed to properly evaluate her credibility. (*Id.* at 15). Claimant asserts that the ALJ's credibility determination was flawed for several reasons. First, Claimant argues that the ALJ improperly relied upon his own lay opinion that Claimant's alleged condition would cause significant muscle weakness or atrophy, which the ALJ found was not present in this case. (*Id.* at 16-17). Second, Claimant avers that the ALJ inappropriately discredited her allegations because she did not use an assistive device for ambulation. (*Id.* at 17). Third, Claimant insists that the ALJ should not have used the fact that Claimant obtained some relief using

8

medications to undermine her credibility. (*Id.*) Finally, Claimant asserts that the ALJ unreasonably emphasized her activities of daily living since her activities do not indicate that she is capable of working a fulltime job that would "require[] her to be on her feet all day long." (*Id.*)

Third, Claimant maintains that the ALJ failed to adequately consider her obesity and its impact on her RFC or on the severity of her other impairments. (*Id.*) Claimant points out that she is five feet two inches tall and has weighed as much as 380 pounds. (*Id.*) Claimant notes that bariatric surgery was recommended, but her insurance company refused to pay for it. (*Id.* at 18). In addition, she indicates that her obesity prevented her from receiving surgery on her knees. (*Id.*) Even in light of this evidence, Claimant argues that the ALJ failed to mention Social Security Ruling ("SSR") 02-1p, which discusses how obesity is to be considered by the SSA, and also neglected to discuss the impact of her obesity on her functioning and other impairments. (*Id.* at 18-19).

In her fourth challenge, Claimant asserts that the ALJ relied on flawed vocational expert testimony. (*Id.* at 19). Claimant generally contends that the ALJ's RFC finding is not supported by substantial evidence, and therefore, the vocational expert's testimony in response to the "flawed RFC cannot be relied on to meet the Commissioner's burden of proof at step five." (*Id.*) Furthermore, Claimant contends that the ALJ failed to include all of her mental restrictions in the RFC finding. (*Id.*) Claimant points out that the ALJ found she had moderate difficulties with concentration, persistence, or pace, but she insists that the ALJ failed to account for these difficulties in the RFC finding and that limiting her to simple, routine, and repetitive tasks was insufficient. (*Id.* at 19-20). Specifically, Claimant asserts that the ALJ should have included restrictions related to her ability to stay on task or maintain a required quota or pace. (*Id.* at 20).

In response, the Commissioner maintains that the ALJ properly discounted the opinions of Dr. Lovette and Dr. Bosholm. (ECF No. 12 at 16). As to Dr. Lovette, the Commissioner contends that Dr. Lovette's opinion was on the ultimate issue of disability, which is an issue reserved to the Commissioner. (*Id.*) Accordingly, the Commissioner asserts that Dr. Lovette's opinion was not entitled to any significant weight. (*Id.*) With respect to Dr. Bosholm, the Commissioner argues that medical evidence does not support her opinion. (*Id.* at 17). The Commissioner asserts that Claimant was found to have 5/5 lower extremity strength with no atrophy as well as full range of motion in her left knee. (*Id.*) Moreover, the Commissioner argues that the most recent x-rays of Claimant's knees revealed no evidence of severe problems. (*Id.*) In addition, the Commissioner claims that other medical evidence, Claimant's activities of daily living, and Claimant's lack of a prescription for an assistive device all support the ALJ's weighing of opinion evidence. (*Id.*)

Second, the Commissioner asserts that substantial evidence supports the ALJ's credibility determination. (*Id.* at 13). First, the Commissioner contends that Claimant's intact muscle strength and lack of atrophy undermine Claimant's allegation of disabling knee pain. (*Id.* at 14). Second, the Commissioner notes that Claimant was instructed by a treater to begin walking more, which the Commissioner asserts is contrary to Claimant's allegations. (*Id.*) Third, the Commissioner notes that Claimant admitted in December 2009 that she had voluntarily stopped taking her medications, that Claimant did not report any knee pain at an appointment in April 2010, and that she did not seek treatment for knee pain from November 2010 to June 2011. (*Id.*) Fourth, the Commissioner contends that Claimant's activities of daily living, including personal care, preparing simple meals, performing limited household chores, driving, shopping, and attending

church, negate her claim of disabling symptoms. (*Id.*) Fifth, the Commissioner again maintains that although Claimant alleged she could not walk, none of her treating physicians had prescribed an assistive device. (*Id.* at 15). Finally, with respect to any alleged mental health limitations, the Commissioner asserts that Claimant did not attend therapy for her depression and that a consultative examiner opined that Claimant was exaggerating her symptoms. (*Id.*) Furthermore, the Commissioner avers that state agency psychologists determined that Claimant could complete simple tasks and work procedures. (*Id.*)

In response to Claimant's third challenge, the Commissioner argues that the ALJ accounted for Claimant's obesity throughout his findings. (*Id.* at 17-18). Specifically, the Commissioner points out the ALJ found that Claimant suffered from morbid obesity and the ALJ discussed SSR 02-1p at step three of the sequential evaluation. (*Id.* at 18). In addition, the Commissioner notes that the ALJ asserted that he considered the entire record before formulating the RFC finding and that the ALJ mentioned Claimant's weight a number of times throughout his RFC discussion. (*Id.*)

Finally, the Commissioner asserts that the ALJ presented a proper hypothetical to the vocational expert. (*Id.*) The Commissioner argues that the ALJ is not required to submit every alleged impairment to the vocational expert; rather, only those limitations the ALJ found credibly established must be presented to the vocational expert. (*Id.*) With respect to any mental limitations, the Commissioner contends that the ALJ accounted for Claimant's moderate difficulties in concentration, persistence, or pace by limiting Claimant to performing simple, routine, and repetitive tasks. (*Id.* at 19).

In reply, Claimant cites the Fourth Circuit's recent decision in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015) and argues that the Fourth Circuit has foreclosed the

Commissioner's argument that limiting a claimant to simple, routine tasks or unskilled work accounts for a claimant's limitations in concentration, persistence, and pace. (ECF No. 13 at 1). Claimant explains that the ability to perform tasks differs from the ability to stay on task. (*Id.* at 1-2).

## V.  <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Medical Treatment Records Prior to the Alleged Onset Date

On June 5, 2007, Claimant presented to Kelly Keen, M.D., at Eastern Carolina University Physicians for a physical examination. (Tr. at 295-300). Claimant's prior medical issues included morbid obesity; headache; depressive disorder, not otherwise specified; left knee pain; and vertigo. (Tr. at 295). Her medications at that time included Ambien, Flexeril, Motrin, Naprosyn, Paxil, Flonase, Depakote, Phenergan, and Valium. (*Id.*) At that visit, Claimant complained of worsening depression with frequent crying spells, although she denied suicidal or homicidal ideations. (Tr. at 296). She also complained of obesity, right knee pain with foot swelling, and joint paint with stiffness. (Tr. at 296-97). Claimant indicated that she was out of medication for treatment of depression and she wished to try medication to help with weight loss. (Tr. at 296). Upon examination, Claimant measured five feet two inches tall and weighed 348 pounds. (Tr. at 297). Dr. Keen noted that Claimant cried during her interview, but she was in no acute distress. (Tr. at 298). Examination of Claimant's extremities revealed no clubbing, cyanosis, edema, or deformity. (*Id.*) Dr. Keen observed that Claimant's gait was normal and the range of motion in her right knee was normal. (*Id.*) In addition, Dr. Keen recorded

that Claimant retained full range of motion of all joints along with normal reflexes coordination, muscle strength, and tone. (*Id.*) Claimant's affect was observed to be depressed. (*Id.*) Dr. Keen assessed Claimant with pain in limb, arthritis secondary to obesity; depressive disorder; morbid obesity; and localized edema, not otherwise specified. (Tr. at 299). Claimant was prescribed Zoloft for depression, Glucosamine for joint pain, Mobic for knee pain, and compression stockings. (*Id.*)

Claimant returned to Dr. Keen on February 12, 2008. (Tr. at 290-94). Claimant complained of depression with mood swings. (Tr. at 291). Claimant informed Dr. Keen that her energy level had decreased and she was having minor problems with memory. (*Id.*) She also continued to complain of right knee pain; however, she was not experiencing locking, clicking, or giving way. (*Id.*) Claimant reported that she had stopped taking Mobic, and she denied experiencing fatigue, lightheadedness, edema to hands or feet, sleep disturbances, or loss of appetite. (Tr. at 291-92). Upon examination, Claimant was in no acute distress. (*Id.* at 292). Dr. Keen observed no swelling in Claimant's right knee and a normal patellar reflex, but medial joint line pain was appreciated on palpation. (*Id.*) Dr. Keen also noted normal stability of the knee. (Tr. at 292-93). Claimant was found to be alert and cooperative with a normal attention span and concentration; however, her affect was mildly flat. (Tr. at 293). Dr. Keen diagnosed Claimant with morbid obesity; depressive disorder, not otherwise specified; pain in limb; and vertigo. (*Id.*) Dr. Keen added Meclizine for vertigo and Promethazine for nausea to Claimant's medication regimen. (*Id.*)

On June 24, 2008, Charles E. Jahrsdorfer, M.D., of ECU Physicians, examined Claimant for complaints of right knee pain. (Tr. at 313-15). Claimant informed Dr. Jahrsdorfer that she began experiencing right knee pain in 2003 after stepping up onto a

curb and that this pain had continued on and off since that time. (Tr. at 313). Claimant described the pain as mild and stated that movement aggravated the pain. (*Id.*) While the pain had been severe days prior to the appointment, Claimant indicated that the pain had gotten much better by the time of her visit. (*Id.*) She also complained of moderate problems with her feet, which occurred intermittently for the previous year. (*Id.*) At the time of her appointment, Claimant weighed 367 pounds. (Tr. at 314). A review of systems was negative for anxiety and depression. (Tr. at 313). Upon examination, Claimant demonstrated normal posture and a limping gait. (Tr. at 314). Claimant exhibited a normal and appropriate affect with normal cognitive functioning. (*Id.*) Dr. Jahrsdorfer recorded that Claimant's muscle strength was 5/5 in all muscles. (*Id.*) Plantar reflexes showed bilateral flexion with normal coordination and gait, and both lower extremities were observed to be normal. (*Id.*) Dr. Jahrsdorfer diagnosed with edema, morbid obesity, joint pain of the lower leg, undiagnosed cardiac murmur, malaise, and fatigue. (Tr. at 315). Dr. Jahrsdorfer discussed with Claimant the need for compliance and follow up as well as diet and regular exercise. (Tr. at 314).

Claimant returned to Dr. Jahrsdorfer on June 30, 2008 reporting pain in the back of her left leg. (Tr. at 311-12). She informed Dr. Jahrsdorfer that she turned and felt a tearing sensation in the back of the left leg, which produced swelling. (Tr. at 311). Dr. Jahrsdorfer also recorded that Claimant had reported severe joint pain that was decreasing prior to the appointment. (*Id.*) Dr. Jahrsdorfer observed that Claimant appeared in no acute distress with a cooperative mood and normal affect. (*Id.*) Examination of the lower extremities was normal, and in particular, Dr. Jahrsdorfer noted that Claimant's left knee was negative for Patellar tap and Bulge sign; however, range of motion was decreased in that knee and movement was painful. (Tr. at 312). In

addition, drawer sign and Apley's grinding tests were positive. (*Id.*) Dr. Jahrsdorfer ordered an MRI of Claimant's left knee. (Tr. at 325).

Keith Begelman, M.D., found the MRI revealed a partially discoid medial meniscus with no evidence of a meniscal tear. (*Id.*) Dr. Begelman found that there was no evidence of a ligamentous or osseous injury. (*Id.*) He did observe a small focal cartilage defect patellar apex with subchondral marrow edema along with mild diffuse cartilage thinning within the medial tibiofemoral compartments and small joint effusion. (*Id.*)

Claimant returned to Dr. Jahrsdorfer on July 11, 2008 for complaints of joint pain and swelling. (Tr. at 309-10). Claimant described joint swelling in both knees and informed Dr. Jahrsdorfer that the swelling was moderate and had occurred in a persistent pattern for years. (Tr. at 309). A review of systems was negative for depression and anxiety. (*Id.*) Upon examination, Dr. Jahrsdorfer noted that Claimant presented with a limping gait, but was in no acute distress. (*Id.*) Claimant's muscle strength was normal in all muscles, but the range of motion in her left knee was limited and painful with positive drawer sign and Apley's grinding tests. (Tr. at 310). Dr. Jahrsdorfer assessed Claimant with anemia, pain in joint involving lower leg, morbid obesity, and edema (*Id.*) He added Lasix and Cyanocobalamin to Claimant's medication regimen. (*Id.*)

### B. Medical Records After the Alleged Onset Date

Claimant began treatment at the James D. Bernstein Community Health Center on January 29, 2009. (Tr. at 352-54). Her health issues at that time included agitated depression, iron deficiency anemia, obesity, and vestibular vertigo. (Tr. at 352). With respect to her depression, Claimant indicated that she had attempted suicide in the past. (*Id.*) However, at that appointment, Claimant appeared pleasant and cooperative. (*Id.*) Jodi Adler, D.O., observed that Claimant was obese and walked with some difficulty due

to knee pain. (*Id.*) Dr. Adler advised Claimant to return in one to two weeks for a follow-up with Dr. Imhoff. (Tr. at 353).

Anna L. Imhoff, M.D., examined Claimant on February 17, 2009. (Tr. at 355-57). Dr. Imhoff recorded that Claimant drank five to six sweet teas per day, which equaled approximately 1000 calories. (Tr. at 355). Claimant reported knee pain and lower extremity edema, which were related to her obesity. (*Id.*) At that appointment, Claimant weighed 372 pounds. (Tr. at 356). Dr. Imhoff observed that Claimant's extremities were normal with the exception of lower extremity edema. (*Id.*) Claimant was assessed with obesity, premenopausal menorrhagia, and urinary frequency. (*Id.*) Dr. Imhoff advised Claimant to stop drinking sweet tea and noted that poor nutritional intake explained Claimant's urinary frequency, weight gain, knee pain, and edema. (*Id.*) Claimant was also counseled on weight loss and advised to begin exercising by walking short distances. (*Id.*)

On May 5, 2009, Claimant reported to Dr. Imhoff that she cut back on drinking sweet tea and other sweets. (Tr. at 358). Dr. Imhoff noted a six pound weight loss, but Claimant continued to experience ankle swelling and knee pain. (*Id.*) Claimant was tearful and felt overwhelmed by the need for weight loss to alleviate her joint pain. (*Id.*) Claimant informed Dr. Imhoff that she had gone to the emergency room for chest pain and had anxiety about that issue, but at the time of her appointment, she was not experiencing chest pain. (*Id.*) Dr. Imhoff referred Claimant to Ken Lovette, M.D., for an assessment of her knee pain. (*Id.*)

Dr. Lovette saw Claimant on May 14, 2009. (Tr. at 361-62). At that appointment, Claimant weighed 369 pounds. (Tr. at 361). Claimant indicated that she was still experiencing ankle swelling and knee pain. (*Id.*) Dr. Lovette assessed Claimant with obesity, premenopausal menorrhagia, and atypical chest pain. (*Id.*) He prescribed

16

Glucosamine. (*Id.*)

Claimant returned to Dr. Lovette on May 21, 2009 for complaints of low back pain and urinary frequency. (Tr. at 363). Upon examination, Claimant appeared alert and in no distress with a normal mood and affect. (*Id.*) Dr. Lovette observed that Claimant's heart rate and rhythm were normal with no murmur, and her extremities were without edema. (*Id.*) Claimant was assessed with urinary tract infection, acute cystitis, and vitamin D deficiency. (*Id.*) Dr. Lovette added Cipro and Calciferol to her prescribed medications. (*Id.*)

Dr. Lovette examined Claimant on August 3, 2009 for knee pain, dyspnea, and wheezing. (Tr. at 366). Claimant informed Dr. Lovette that she injured her right knee four years earlier, which caused her worsening difficulty in weight bearing on that leg. (*Id.*) Examination of Claimant's right knee revealed maximal tenderness in the medial collateral ligament; however, no effusion was noted and a drawer test was negative. (*Id.*) Dr. Lovette administered a Kenalog injection to Claimant's right knee and prescribed Lortab and Zithromax. (Tr. at 366-67).

On August 24, 2009, Claimant again visited Dr. Lovette for knee pain, which was improving. (Tr. at 369). However, Claimant continued to have maximum tenderness in the medial collateral ligament of her right knee. (*Id.*) Claimant received a Kenalog injection to her knee as well as a prescription for Topamax. (*Id.*)

On December 14, 2009, Claimant visited Cynthia Witt, M.D., with complaints of mid to low backache, which began three days prior to her appointment. (Tr. at 375). Claimant indicated that she had stopped taking many of her prescribed medications. (*Id.*) Upon examination, Dr. Witt noted that Claimant was in no acute distress and exhibited an appropriate affect. (*Id.*) Dr. Witt assessed Claimant with suspected muscular pain of

the back and prescribed cyclobenzaprine. (Tr. at 375-76).

On June 1, 2010, Claimant returned to Dr. Whitt with complaints of knee pain stemming from an injury that occurred in 2003. (Tr. at 383). Claimant reported that her knee "locked up" and was very painful. (*Id.*) She told Dr. Whitt that nothing seemed to relieve her symptoms, although she indicated that steroid injections had helped in the past. (*Id.*) Claimant also described experiencing a vertigo episode prior to her appointment and stated that she was out of her vertigo medication. (*Id.*) An examination of Claimant's right knee revealed maximal tenderness in the medial collateral ligament, but no swelling was noted. (*Id.*) Dr. Whitt prescribed Furosemide and Meclizine, and she encouraged Claimant to exercise regularly and follow a healthy diet. (Tr. at 383-84).

On June 16, 2010, Claimant reported to Pitt County Memorial Hospital for x-rays of her right knee as ordered by Dr. Lovette. (Tr. at 324). Angelle Harper, M.D., observed no acute fracture or dislocation. (*Id.*) She noted interval advanced changes of osteoarthritis when compared with a 2002 x-ray of Claimant's right knee. (*Id.*) In addition, Dr. Harper observed suprapatellar joint effusion. (*Id.*)

Claimant returned to Dr. Lovette on July 13, 2010 complaining of knee pain, vertigo, edema, and a depressed mood. (Tr. at 386). Claimant reported that her right knee continued to hurt and "lock up." (*Id.*) Dr. Lovette recorded that x-rays of Claimant's knee evidenced osteoarthritis, and Claimant indicated that she was scheduled to see an orthopedist on July 21. (*Id.*) Dr. Lovette also noted that Claimant was very emotional, and she told Dr. Lovette that her "life in general" continued to worsen. (*Id.*) At that appointment, Claimant weighed 380 pounds. (*Id.*) With respect to Claimant's vertigo, she reported that it had improved. (*Id.*) Upon examination, Dr. Lovette recorded that Claimant experienced maximal tenderness in the medial collateral ligament of the right

18

knee and that she exhibited 2+ dependent edema. (*Id.*) Dr. Lovette prescribed Naproxen and instructed Claimant to follow a healthy diet, participate in regular exercise, and avoid activities that aggravated her knee pain. (Tr. at 387).

On September 27, 2010, Claimant informed Dr. Lovette that her knee pain remained the same and that her knee continued to "lock up." (Tr. at 389). At that visit, Dr. Lovette recorded that Claimant appeared very emotional. (*Id.*) Claimant had lost twelve pounds since her July 2012 appointment. (*Id.*) Dr. Lovette's examination findings with respect to Claimant's knee remained the same. (*Id.*) Dr. Lovette assessed Claimant with knee pain and dependent edema, and he prescribed Anaprox. (Tr. at 389-90). He again encouraged Claimant to follow a healthy diet and participate in regular exercise. (Tr. at 390).

On October 26, 2010, Claimant continued to complain of right knee pain, edema, and depression. (Tr. at 392). At that time, Claimant had yet to visit an orthopedist. (*Id.*) Dr. Lovette's findings as to Claimant's right knee remained unchanged. (*Id.*) Dr. Lovette prescribed Anaprox, Celexa, Prilosec, and Cortisporin. (Tr. at 393). Claimant was advised to exercise regularly, follow a healthy diet, avoid activity that aggravated her knee pain, use compression wrap, and elevate her leg. (*Id.*) Dr. Lovette provided Claimant with a referral to Family Medical Therapy for her depression. (*Id.*)

On November 18, 2010, Claimant was examined by Philip S. Perdue, Jr., M.D., at Orthopaedics East & Sports Medicine Center after being referred there by Dr. Lovette. (Tr. at 333). Claimant's history of right knee pain included issues since the previous summer and the need for an aspiration in 2009 due to swelling. (*Id.*) Upon examination, Dr. Perdue recorded mild crepitus in the right knee as well as tenderness at the anterior, lateral, and medial joint line of the right knee. (*Id.*) Dr. Perdue noted that x-rays of the

knee revealed very minimal to mild arthritis and that a prior MRI study showed mild to moderate osteoarthritis, but no obvious meniscus tear. (*Id.*) Dr. Perdue advised Claimant that her best option was to lose weight, and he offered to refer Claimant to a bariatric surgeon. (*Id.*) In addition, Dr. Perdue performed an injection of Celestone and Marcaine. (*Id.*)

On June 30, 2011, Claimant returned to Dr. Lovette for knee pain, edema, and depression. (Tr. at 395). Dr. Lovette noted that Claimant had been seen by Dr. Perdue and that Dr. Perdue had recommended weight loss before performing any surgery on Claimant's right knee. (*Id.*) Claimant informed Dr. Lovette that her knee pain was moderately relieved by nonsteroidal anti-inflammatory drugs and that she did not have the resources to undergo bariatric surgery. (*Id.*) In addition, Claimant indicated that her depression had been exacerbated by the recent deaths of several of her relatives, but she was taking appropriate action to deal with that issue. (*Id.*) Dr. Lovette noted that Claimant's weight was 358 pounds at that appointment. (*Id.*) Claimant continued to experience maximal tenderness in the medial collateral ligament of her right knee, but no effusion was observed. (*Id.*) Dr. Lovette diagnosed Claimant with knee pain, dependent edema, and degenerative joint disease. (*Id.*) He prescribed Wellbutrin, tramadol, hydroxyzine, and triamcinolone acetonide lotion. (Tr. at 396).

On August 11, 2011, Claimant again visited Dr. Lovette and reported experiencing knee pain and depression. (Tr. at 398). Claimant indicated that Wellbutrin was not helping her depression. (*Id.*) She also informed Dr. Lovette that she was applying for disability benefits. (*Id.*) Dr. Lovette's examination findings regarding Claimant's right knee remained the same, and he added neurotic depression to his assessment of Claimant's condition. (*Id.*) Dr. Lovette prescribed Effexor, trazodone, and Floricet. (Tr. at

399).

On October 4, 2011, Claimant underwent x-rays of both knees at Eastern Radiologists. (Tr. at 340-41). Bobby Walters, M.D., observed that an x-ray of Claimant's left knee revealed no obvious fracture. (Tr. at 340). The examination of the left knee was considered a limited evaluation for joint space narrowing due to the suboptimal positioning on the AP radiograph. (*Id.*) Dr. Walters did note that there appeared to be mild osteophyte formation within the lateral and patellofemoral compartments of the left knee. (*Id.*) With respect to Claimant's right knee, Dr. Walters recorded that there was no obvious fracture; however, there did appear to be mild to moderate tri-compartmental osteoarthritis. (Tr. at 341). Dr. Walters noted the evaluation of the right knee was limited due to Claimant's positioning and obesity. (*Id.*)

Claimant returned to Dr. Lovette on October 25, 2011 reporting that she was attempting to obtain disability to help pay for surgery. (Tr. at 401). Dr. Lovette noted that Claimant's edema appeared stable. (*Id.*) As for Claimant's depression, she indicated that Effexor caused her extreme nausea. (*Id.*) At that visit, Claimant's weight was 366 pounds. (*Id.*) Dr. Lovette's findings with respect to Claimant's right knee and Claimant's diagnoses remained unchanged. (*Id.*) Claimant was prescribed Zofran, Prozac, and amlodipine. (Tr. at 402).

Claimant next visited Dr. Lovette on December 13, 2011 continuing to report knee pain. (Tr. at 404). Dr. Lovette injected both of Claimant's knees with Solu-Medrol, which Claimant tolerated well. (*Id.*) Claimant's diagnoses and prescribed medications remained the same. (Tr. at 404-05).

On January 16, 2012, Claimant reported to Dr. Lovette that Dr. Perdue would not perform surgery unless she lost seventy-five pounds. (Tr. at 462). Dr. Lovette suggested

that Claimant's case be discussed with a bariatric surgeon, and Claimant indicated that she was interested in bariatric surgery. (*Id.*) Claimant also informed Dr. Lovette that her depression was stable. (*Id.*) Dr. Lovette noted tenderness in the medial collateral ligament of Claimant's right knee and injected both knees with Solu-Medrol. (*Id.*)

Claimant again treated with Dr. Lovette on February 28, 2012. (Tr. at 465). Claimant reiterated that her depression was stable. (*Id.*) Dr. Lovette noted that his findings with respect to Claimant's right knee were unchanged from the last appointment, and he again injected both knees with Solu-Medrol. (*Id.*) Less than two months later, on April 9, 2012, Claimant followed up with Dr. Lovette for her knee pain. (Tr. at 468). Dr. Lovette's findings were the same, and Claimant again received knee injections. (*Id.*) Dr. Lovette prescribed diclofenac sodium. (Tr. at 469). As for Claimant's depression, she indicated that her condition was stable. (Tr. at 468).

On May 11, 2012, Claimant visited the Bernstein Community Health Center for bilateral knee pain and low back pain, which was exacerbated when standing. (Tr. at 471). Claimant indicated that an orthopedic surgeon would not perform surgery on Claimant until she lost weight; however, Claimant was in the process for undergoing gastric bypass surgery. (*Id.*) Upon examination, Claimant's mood and affect were normal. (Tr. at 472). Additionally, Claimant's extremities were absent for edema. (*Id.*) Claimant was assessed with uncontrolled obesity, uncontrolled knee pain, depression, and controlled low back pain, and she was prescribed Flexeril. (*Id.*)

Claimant visited Carol C. Bosholm, M.D., on August 17, 2012. (Tr. at 492). Claimant reported that she was applying for disability due to knee pain. (*Id.*) Dr. Bosholm observed that Claimant presented with an abnormal, "waddling" gait and that Claimant had difficulty climbing up to the examination table. (*Id.*) Dr. Bosholm diagnosed Claimant

with knee pain; localized, primary osteoarthritis of the lower leg; nausea; depressive disorder; and morbid obesity (Claimant weighed 347 pounds at that time). (*Id.*) Claimant was prescribed a cane along with Celexa and Zofran. (*Id.*) At that time, Claimant's long term medications included Meclizine, Promethazine, Naproxen, Furosemide, Prozac, and amiodipine. (Tr. at 494).

On November 19, 2012, Claimant returned to Dr. Bosholm for her knee pain. (Tr. at 495). Claimant reported that her pain increased with walking, and that she could only walk thirty feet without needing to sit down. (*Id.*) Claimant rated her pain as an eight (presumably on a ten-point scale). (*Id.*) Dr. Bosholm recorded that Claimant's weight was 343 pounds at that visit, and her body mass index was 63.89. (*Id.*) Dr. Bosholm prescribed Naproxen and Tramadol, and she referred Claimant to orthopedics and physical therapy. (Tr. at 495-96).

Claimant returned to Dr. Perdue on January 9, 2013 for an evaluation. (Tr. at 499). Claimant indicated that she was on Medicaid, but she had been denied gastric bypass surgery. (*Id.*) Upon examination, Dr. Perdue recorded that Claimant was morbidly obese with severe pain in both knees, which rendered her minimally active. (*Id.*) Dr. Perdue noted that prior x-rays displayed advanced tri-compartmental osteoarthritis in both knees. (*Id.*) Claimant received injections of Celestone and Marcaine in both knees. (*Id.*) Dr. Perdue opined that Claimant was a likely candidate for gastric bypass surgery and indicated that he would contact the Vidant Medical Center to determine why Claimant was not scheduled for surgery. (*Id.*) Dr. Perdue continued to be believe that Claimant was not a candidate for knee surgery at that time. (*Id.*)

### C. Evaluations and Opinions

On August 11, 2011, Dr. Lovette prepared a letter opining that Claimant was

disabled from work due to chronic degenerative arthritis of both knees. (Tr. at 335). He asserted that Claimant would require joint replacement surgery to remedy her condition. (*Id.*) However, because Claimant was not insured, Dr. Lovette opined that obtaining disability would be the only way she could receive the surgery. (*Id.*)

On October 4, 2011, Claimant underwent a disability evaluation by E.C. Land, M.D., on behalf of the North Carolina Department of Health and Human Services. (Tr. at 337-39). Dr. Land noted that Claimant had a history of morbid obesity and that her weight at that time was 370 pounds. (Tr. at 337). Claimant reported that her right knee symptoms began approximately eight years prior and that they had worsened over time. (*Id.*) She described the right knee pain as severe and reported that the pain radiated into her low back. (*Id.*) Claimant indicated that her right knee and back pain were constant and exacerbated by standing for longer than five minutes. (*Id.*) Claimant informed Dr. Land that she slept in a recliner due to problems positioning her right knee and that she used a cane to help her ambulate. (*Id.*) She also indicated that she was independent in self-care activities. (*Id.*) At the time of the evaluation, Claimant reported that she was taking Prilosec and Effexor. (*Id.*)

Dr. Land's examination of Claimant's extremities revealed pedal pulses at +1 as well as +1 nonpitting edema from the feet to the knees. (Tr. at 338). Dr. Land found no extremity clubbing or cyanosis. (*Id.*) Claimant exhibited full flexion and extension in both hip joints. (*Id.*) Claimant's left knee joint showed full passive flexion while right knee flexion was at a maximum of seventy to eighty degrees with full extension of the right knee joint. (*Id.*) Dr. Land noted that detailed examination of the knees was moderately difficult due to overlying fat with poor definition of the knee structures. (*Id.*) Further, he recorded that Claimant's ankles, toes, shoulders, elbows, wrists, and finger joints all showed full

24

passive range of motion. (*Id.*) Claimant also displayed full range of motion of the cervical spine. (*Id.*)

Dr. Land found that Claimant's muscle strength was 5/5 at the grips, deltoids, and dorsiflexors of the feet; however, muscle strength testing of the quads ranged from -4 to +4/5 due to discomfort. (*Id.*) Claimant had no muscle atrophy of her upper or lower extremities. (*Id.*) Dr. Land noted that he was unable to test deep tendon reflexes at the knees and ankles. (*Id.*)

Additionally, Dr. Land observed that Claimant's gait revealed a mild valgus deformity of the knees. (Tr. at 339). He described Claimant's gait pattern as broad-based with short strides. (*Id.*) She did not use an assistive device to aid her in ambulating at the evaluation. (*Id.*) Dr. Land recorded that Claimant could sit in a chair, stand, and put her shoes on, but she required assistance to place her socks on. (*Id.*)

Dr. Land diagnosed Claimant with morbid obesity, depression, moderate degenerative arthritis with primary involvement of the right knee joint, and a history of meniscal tear in the right knee. (*Id.*) Dr. Land opined that Claimant was severely restricted in her ability to stand for "extensive time periods," crawl, stoop, and squat due to severe arthritis of the knees. (*Id.*) He further indicated that Claimant had no restriction in her abilities to use her hands above her head and to perform fine finger movements. (*Id.*)

On October 13, 2011, Ted Jamison, M.A., performed a Comprehensive Clinical Psychological Evaluation for the North Carolina Department of Health and Human Services. (Tr. at 343-46). Mr. Jamison noted that Claimant had reported complaints of severe degenerative arthritis of both knees; chronic pain; severe problems with walking, standing, and sitting; depression; anxiety; crying; vertigo; obesity; memory problems;

concentration; and focusing. (Tr. at 343). Mr. Jamison observed that Claimant was very obese and walked with a slow gait. (*Id.*) She stood up once during the evaluation due to knee pain. (*Id.*)

Claimant told Mr. Jamison that she could no longer work due to pain and "memory loss," which affected both her short-term and long-term memory (*Id.*) She also reported experiencing depression and anxiety, but she had never participated in therapy for these conditions. (*Id.*) Claimant informed Mr. Jamison that she could take care of her personal needs, although sometimes her children offered assistance. (Tr. at 344). As for Claimant's social ability, she reported that she lived with several family members and that she had friends in the community. (*Id.*) She also indicated that she had never experienced problems with co-workers or supervisors. (*Id.*) On the subject of education, Claimant stated that she quit school in tenth grade after excessive absenteeism due to illness and that she believed she was in special education. (*Id.*) With respect to her daily activities, Claimant explained that she spent her time sitting on the couch, watching television, and socializing with her daughter. (*Id.*)

Upon mental status examination, Claimant was cooperative with normal speech rate and rhythm. (*Id.*) Claimant reported that she felt "angry, hurt, [and in a] lot of pain," and that she "sometimes" felt depressed. (*Id.*) Mr. Jamison observed that Claimant's thought processes were coherent and that she was fully oriented. (Tr. at 344-45). Claimant denied experiencing any suicidal ideation, hallucinations, or delusions. (*Id.*) Mr. Jamison opined that Claimant's insight was adequate and her intelligence was average. (Tr. at 345). Mr. Jamison recorded that Claimant had some memory difficulty during the examination, but he was concerned that Claimant did not put forth a sufficient effort and that she was exaggerating her memory trouble. (Tr. at 345-46). In addition, Mr. Jamison

noted that Claimant was able to sustain her attention to complete the tasks presented throughout the examination and that she was able to understand directions. (Tr. at 346).

Mr. Jamison diagnosed Claimant with depressive disorder, not otherwise specified, and assigned a Global Assessment of Functioning ("GAF") score of sixty-five.[2] He noted that Claimant was very clear that the reason she was applying for disability was due to "knee problems and depression due to her situation." (*Id.*) Mr. Jamison concluded that Claimant "did not present any mental health reason that she could not be gainfully employed." (*Id.*)

On October 21, 2011, Theodore Weber, Psy.D., completed a Psychiatric Review Technique for the period from December 23, 2008 through the date of report. (Tr. at 61-62). Dr. Weber determined that Claimant had a medically determinable impairment of affective disorder that resulted in Claimant experiencing mild limitation in activities of daily living; moderate limitation in maintaining social functioning; and moderate difficulty in maintaining concentration, persistence, or pace. (Tr. at 61). He opined Claimant had one or two repeated episodes of decompensation of extended duration. (*Id.*) Dr. Weber found that the evidence did not establish the presence of the paragraph "C" criteria for Listing 12.04. (*Id.*) In the explanation portion of the form, Dr. Weber summarized Mr. Jamison's findings and noted that Claimant had a history of depression.

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

(Tr. at 62). Dr. Weber pointed out that Claimant took Effexor and did not attend therapy. (*Id.*) He also emphasized that Claimant was able to sustain attention during Mr. Jamison's examination and complete tasks during that examination. (*Id.*) Ultimately, Dr. Weber opined that Claimant was partially credible. (*Id.*)

On that same date, Dr. Weber completed a Mental RFC Assessment. (Tr. at 64-67). As to understanding and memory, Dr. Weber opined that Claimant was not significantly limited in her abilities to remember locations and work-like procedures, and understand and remember very short and simple instructions. (Tr. at 65). In contrast, Dr. Weber found that Claimant was moderately limited in her ability to understand and remember detailed instructions. (*Id.*) Overall, Dr. Weber concluded that Claimant could follow simple instructions. (*Id.*) As to sustained concentration and persistence, Dr. Weber determined that Claimant was not significantly limited in her abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) In addition, Dr. Weber found that Claimant was moderately limited in her abilities to maintain attention and concentration for extended periods of time, and carry out detailed instructions. (*Id.*) Dr. Weber opined that Claimant could sustain attention to perform unskilled tasks. (*Id.*) With respect to social limitations, Dr. Weber indicated that Claimant was not significantly limited in her abilities to interact appropriately with the general public, ask simple questions or request assistance, get along with co-workers or peers

without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. at 66). However, Dr. Weber opined that Claimant was moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) As to adaptation, Dr. Weber determined that Claimant was not significantly limited in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation. (*Id.*) On the other hand, Dr. Weber found that Claimant was moderately limited in her ability to set realistic goals or make plans independently of others. (*Id.*) Dr. Weber opined that "overall, [Claimant is] capable of completing simple tasks on a regular basis." (Tr. at 67).

On December 9, 2011, W.W. Albertson, Ed.D., reviewed Dr. Weber's opinions on reconsideration. (Tr. at 90-91, 96). Dr. Albertson agreed with Dr. Weber's initial opinions contained in both the Psychiatric Review Technique and Mental RFC Assessment. (Tr. at 90, 96). However, Dr. Albertson found that Claimant was more limited in certain mental RFC areas; specifically, Dr. Albertson determined that Claimant was moderately limited in her abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without any unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. (Tr. at 94-95). Overall, Dr. Albertson concluded that Claimant was capable of performing simple, routine, and repetitive tasks. (Tr. at 90, 96).

Robert N. Pyle, M.D., completed a Physical RFC Assessment on December 9, 2011. (Tr. at 92-93). With respect to exertional limitations, Dr. Pyle opined that Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five

pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push/pull without limitation (other than Claimant's lifting and/or carrying limitations). (Tr. at 92). Dr. Pyle concluded that Claimant did not have any postural, manipulative, visual, and communicative limitations. (*Id.*) As to environmental limitations, Dr. Pyle determined that Claimant could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation; however, she should avoid concentrated exposure to hazards, such as machinery or heights, due to her history of vertigo. (Tr. at 92-93). In his RFC explanation, Dr. Pyle noted that the evidence in Claimant's file demonstrated a history of joint effusion, cartilage defect, and morbid obesity. (Tr. at 93). Dr. Pyle also acknowledged that a November 2010 x-ray of Claimant's knee showed minimal to mild arthritis. (*Id.*) In addition, Dr. Pyle summarized Dr. Land's findings at the consultative evaluation and assigned some weight to Dr. Land's opinion that Claimant would be severely limited in her ability to stand for extensive time periods, crawl, stoop, and squat. (*Id.*) Dr. Pyle recognized that other x-ray findings included mild to moderate osteoarthritis of the right knee with minimal osteophyte formation in the left knee; however, Dr. Land could not perform a detailed examination of Claimant's knees at the consultative evaluation due to overlying skin and poor definition of the knee structures. (*Id.*) Dr. Pyle opined that Claimant was partially credible. (*Id.*)

On August 17, 2012, Dr. Bosholm completed a Multiple Impairment Questionnaire. (Tr. at 481-88). Dr. Bosholm indicated that she had treated Claimant every three months since January 2009. (Tr. at 481). Dr. Bosholm opined that Claimant suffered from osteoarthritis of the knees and morbid obesity. (*Id.*) She noted that Claimant's knees would not improve without surgical intervention; however, Claimant

could not undergo surgery on her knees until she lost weight. (*Id.*) As to clinical findings supporting Dr. Bosholm's diagnoses, Dr. Bosholm listed Claimant's difficulty in ambulating and inability to walk for one block due to pain. (*Id.*) Dr. Bosholm noted that a knee x-ray taken in June 2010 revealed interval advancement of changes of osteoarthritis with loss of joint height since 2002. (Tr. at 482). As for Claimant's primary symptom, Dr. Bosholm indicated that Claimant complained of pain with ambulation, which Dr. Bosholm believed was reasonably consistent with Claimant's physical impairments. (*Id.*) Dr. Bosholm recorded that Claimant's pain was located in both knees, with greater pain from the right knee, and that the pain was constant and increased with weight bearing. (*Id.*) Dr. Bosholm rated Claimant's pain level and fatigue as severe, and she explained that Claimant's pain was not completely relieved with medication. (Tr. at 483).

In assessing Claimant's RFC, Dr. Bosholm opined that, in a competitive five-day workweek environment, Claimant could sit, stand, or walk up to one hour in an eight-hour workday. (*Id.*) Claimant would need to get up and move around every ten to fifteen minutes and not sit again for fifteen minutes. (Tr. at 483-84). Dr. Bosholm indicated that it would be necessary or medically recommended that Claimant not stand or walk continuously in a work setting. (Tr. at 484). In addition, Claimant could not push, pull, kneel, bend, or stoop. (Tr. at 487). With respect to lifting and carrying, Dr. Bosholm determined that Claimant could occasionally lift ten pounds and occasionally carry ten to twenty pounds. (Tr. at 484). Dr. Bosholm opined that Claimant did not have any significant limitations in repetitive reaching, handling, fingering, or lifting, and that Claimant had no limitations as to upper extremities. (Tr. at 484-85).

Dr. Bosholm believed that Claimant's symptoms would likely increase if she were

placed in a competitive work setting. (Tr. at 485). She opined that Claimant experienced pain, fatigue, or other symptoms that would constantly interfere with Claimant's attention and concentration and that emotional factors also contributed to Claimant's symptoms and functional limitations. (Tr. at 486). Dr. Bosholm did not believe Claimant was a malingerer. (*Id.*) On the subject of work stress, Dr. Bosholm concluded that Claimant could tolerate low stress at work. (*Id.*) With respect to breaks during the workday, Dr. Bosholm opined that Claimant would need to take a fifteen-minute break every thirty minutes. (*Id.*) Dr. Bosholm noted that Claimant would be absent from work more than three times per month due to her impairments and treatment. (Tr. at 487).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

### A. The ALJ's Evaluation of Opinion Evidence

Claimant's first challenge relates to the ALJ's evaluation of the medical opinion evidence. Claimant believes that the ALJ incorrectly weighed the opinions provided by Dr. Lovette and Dr. Bosholm. (ECF No. 9 at 11-13). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions.[4] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[4] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Beginning with Dr. Bosholm's opinion, the ALJ recognized that Dr. Bosholm

concluded Claimant was restricted to less than sedentary work due to her obesity and osteoarthritis of the knees. (Tr. at 24). The ALJ noted that Dr. Bosholm determined Claimant could lift a maximum of ten pounds, sit for one hour in an eight-hour workday, and walk or stand for one hour in an eight-hour workday. (*Id.*) In addition, Dr. Bosholm concluded that Claimant would require breaks every thirty minutes and would be absent from work more than three times per month. (*Id.*) The ALJ assigned these opinions no weight because they were not "supported by the treatment reports and objective findings." (*Id.*) While the ALJ did not reference specific medical evidence or exhibits in his one-sentence rejection of the treating physician's opinion, one can presume that the ALJ's assessment relied on the medical records and evaluations summarized throughout the ALJ's RFC discussion. However, it is unclear which of these medical records and evaluations that the ALJ believed undermined the treater's opinion, particularly when many of the findings summarized by the ALJ support Dr. Bosholm's opinion. For example, the ALJ recognized that Claimant consistently reported ankle swelling, knee pain, and weight bearing difficulty to her treaters. (Tr. at 22). During a number of physical examinations, Claimant's right knee exhibited maximal tenderness in the medial collateral ligament with 2+ edema of the extremities. (Tr. at 22, 366, 386, 389, 392, 404, 465). Moreover, a June 2010 x-ray of Claimant's right knee showed advancing osteoarthritis, and an October 2011 x-ray of her right knee revealed mild to moderate tri-compartmental osteoarthritis. (*Id.* at 324, 341). Similarly, Dr. Perdue noted in November 2010 that a prior MRI study of Claimant's right knee showed mild to moderate osteoarthritis. (*Id.* at 333).

The ALJ seemed to discount these medical findings and reports of symptoms by relying, in part, on Dr. Land's finding that Claimant possessed 5/5 muscle strength at the

grips, deltoids, and dorsiflexors of the feet, and the lack of evidence of atrophy in Claimant's lower extremities. (Tr. at 22-23). However, the ALJ failed to explain how full muscle strength in those areas would affect Claimant's use of her knees to ambulate. Additionally, as Claimant points out, the ALJ cited no support for an assumption that atrophy would be present in this case. Indeed, despite Dr. Land's finding that atrophy was absent, Dr. Land opined that Claimant would be "severely restricted" in her ability to stand for extended time periods due to the arthritis in her knees, an opinion which the ALJ determined warranted limited weight without any substantive explanation.[5] (Tr. at 24, 339); *see Oakley v. Colvin*, No. 3:13-cv-679, 2015 WL 1097388, at *12 (N.D.N.Y. Mar. 11, 2015) (finding opinion by ALJ that muscle atrophy would be present given claimant's allegations was "lay speculation" and "did not account for difficulties treating and medical sources inevitably would have encountered in detecting muscle atrophy in a morbidly obese patient.").

The ALJ may also have discounted Dr. Bosholm's opinion based on the treatment that Claimant received for her osteoarthritis. The ALJ emphasized in his written decision that Claimant received some relief from anti-inflammatory medication; however, it appears that Dr. Lovette believed Claimant was a candidate for surgery on her knees and that Dr. Perdue would have held the same opinion had Claimant lost enough weight to undergo surgery.[6] (Tr. at 23, 333, 335). Furthermore, contrary to the ALJ's finding, Claimant's activities of daily living did not reveal a level of functional ability that completely contradicted Dr. Bosholm's opinion. In a July 2011 Third Party Adult Function

---

[5] Dr. Land also found that Claimant had reduced range of motion in her right knee. (Tr. at 23).

[6] Moreover, to the extent that the ALJ discounted Dr. Bosholm's opinion based on Claimant's lack of prescription for an assistive device, Dr. Bosholm prescribed a cane for Claimant in August 2012. (Tr. at 492).

Report, Claimant's daughter indicated that Claimant could care for her personal needs, perform "very little house cleaning" (a total of two hours each week), could not perform yard work, could shop for one hour twice each month, and could attend church each week. (*Id.* at 235-38). These limited activities do not clearly correspond with an ability to work an eight-hour workday at a less than full-range of light work. *See Hines v. Barnhart*, 453 F.3d 559, 565-66 (4th Cir. 2006) (finding claimant's ability to occasionally perform housework and yardwork as well as attend church did not render him nondisabled). Overall, the undersigned **FINDS** that the ALJ failed to sufficiently explain how he arrived at the weight he assigned to Dr. Bosholm's opinion, and that he did not adequately discuss the "significantly probative evidence he reject[ed]." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler*, 739 F.2d. 1393 (9th Cir. 1984)). The ALJ's RFC discussion merely summarizes physical examination and radiological findings without pointing to those that the ALJ believes are inconsistent with Dr. Bosholm's conclusions. In fact, much of the evidence summarized by the ALJ seems to support Dr. Bosholm's opinion rather than contradict it, and after thoroughly reviewing the ALJ's RFC discussion, the undersigned cannot determine what medical evidence the ALJ believed was in contrast with Dr. Bosholm's opinion. Accordingly, the undersigned **RECOMMENDS** that the presiding District Judge **REVERSE** the final decision of the Commissioner and **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g), so that the ALJ may reconsider Dr. Bosholm's opinion and more fully explain the weight that he assigns to Dr. Bosholm's opinion.

In relation to Dr. Lovette's opinion, the ALJ acknowledged that Dr. Lovette was one of Claimant's treating physicians and that Dr. Lovette had opined that Claimant was unable to work as a result of her degenerative arthritis. (Tr. at 24). The ALJ recognized

that Dr. Lovette's opinion concerned an issue reserved to the Commissioner, but nonetheless assigned little weight to the opinion because it was not supported by the longitudinal record. (*Id.*) The ALJ was correct that Dr. Lovette's opinion relates to an issue solely within the Commissioner's province. Nevertheless, given the undersigned's recommendation that this case be remanded, the ALJ should revisit Dr. Lovette's opinion on remand. *See* SSR 96-5P, 1996 WL 374183, at *2 ("If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.").

### B. The ALJ's Credibility Analysis

In her second challenge to the Commissioner's decision, Claimant asserts that the ALJ failed to properly evaluate her credibility. (ECF No. 9 at 15-17). Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could

reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to

support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ scrutinized Claimant's allegations of her symptoms using the two-step process required by the regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 23). Second, the ALJ concluded that Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (*Id.*) The ALJ supplied a number of reasons for discounting Claimant's allegations. On the subject of Claimant's statements regarding her osteoarthritis, the ALJ asserted that Claimant had "5/5 strength and no atrophy" at her evaluation with Dr. Land, that Claimant experienced some relief from anti-inflammatory medication, that Claimant was not prescribed an assistive device, and that Claimant "was cooperative and in no acute distress." (*Id.*) On the subject of Claimant's allegations regarding her depression, the ALJ stated that Claimant's "mental status was generally normal, with occasional mild findings at best," and that there was no evidence Claimant received "inpatient or outpatient treatment" for her depression. (*Id.*) Additionally, the ALJ also found that Claimant's credibility was damaged given her activities of daily living, including her ability to care for her personal needs, shop, prepare simple meals, perform limited household chores, drive, and attend church. (*Id.*)

42

The undersigned **FINDS** that the ALJ's credibility analysis is flawed because the ALJ discounted Claimant's credibility based on inaccurate findings of fact or relied on facts that matter little in assessing Claimant's credibility. As an example of the former, the ALJ stated that Claimant had not been prescribed an assistive device; however, Dr. Bosholm prescribed a cane for Claimant in August 2012.[7] (Tr. at 492). In relation to the latter, Dr. Land's finding that Claimant had 5/5 strength did not relate to Claimant's knees, rather, that finding related to the muscle strength in Claimant's grips, deltoids, and dorsiflexors of the feet. (Tr. at 338). Accordingly, it is unclear how that specific finding detracts from Claimant's credibility. Moreover, the ALJ neglected to explain how Claimant's credibility was harmed by her one-time report that an anti-inflammatory drug provided her some relief. Even with this reported relief, Claimant consistently complained of knee pain to her treating physicians and continued to seek treatment for her knee condition. On remand, the ALJ should reconsider Claimant's credibility to address these errors. In addition, the ALJ should reassess Claimant's credibility in light of his reconsideration of Dr. Bosholm's and Dr. Lovette's opinions. *See* 20 C.F.R. §§ 404.1529(c)(1)-(2), 416.929(c)(1)-(2) (providing that, in evaluating claimant's credibility, ALJ must consider medical opinion evidence).

### C. The ALJ's Consideration of Claimant's Obesity

In her third challenge to the Commissioner's decision, Claimant asserts that the ALJ erred in neglecting to adequately consider her obesity. (ECF No. 9 at 17). Obesity is identified as a medically determinable impairment and generally addressed by SSR 02–1P. 2002 WL 34686281, at *1. The Ruling identifies four ways obesity may be considered

---

[7] On remand, the ALJ may wish to develop the record as to Claimant's use of an assistive device.

in the sequential evaluation process. It may be considered in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of a listing; and whether the individual's impairments prevent her from doing her past relevant work or other work existing in significant numbers in the national economy. *Id.* at \*3. The Ruling provides that "[w]hen establishing the existence of obesity, [the SSA] will generally rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* Therefore, "in the absence of evidence to the contrary in the case record, [the SSA] will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *Id.*

In considering obesity at step two of the sequential evaluation, "[t]here is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment," and "[n]either do descriptive terms for levels of obesity (e.g., 'severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes." *Id.* at \*4. Ultimately, the SSA conducts an individualized assessment of an individual's obesity in determining whether an individual's obesity impacts his or her functioning to the degree that a finding of "severe" is appropriate. *Id.*

When evaluating obesity under the Listing at step three of the sequential evaluation, the SSA will not make assumptions "about the severity or functional effects of obesity combined with other impairments." *Id.* at \*5. The SSA will not make such assumptions because "[o]besity in combination with impairment may or may not increase the severity or functional limitations of the other impairments." *Id.* Therefore, in each case, an individualized determination of a claimant's functional limitations as a result of obesity will be made based on the medical record. *Id.*

44

At steps four and five of the sequential evaluation, the SSA assesses the residual functional capacity of a claimant. The SSA recognizes that "[o]besity can cause limitation of function." *Id.* at *6. Specifically, as a result of obesity:

> An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

*Id.* The SSA must take this into consideration when completing an individualized assessment of a claimant's residual functional capacity. Ultimately, the SSA "will explain how [it] reached [its] conclusions on whether obesity caused any physical or mental limitations" with respect to a claimant's residual functional capacity. *Id.* at *7.

Undoubtedly, substantial evidence existed to support the conclusion that Claimant had the medically determinable impairment of obesity. In fact, the ALJ found at step two that Claimant's morbid obesity was a severe impairment. (Tr. at 19). At step three of the sequential process, the ALJ cited the Ruling related to obesity and recognized the requirements of the Ruling in evaluating a claimant's obesity. (*Id.* at 20). In assessing Claimant's RFC, the ALJ repeatedly mentioned Claimant's weight at various appointments and recognized that Claimant could not undergo surgery on her knees due to her weight. (*Id.* at 22-23). The ALJ also summarized the opinions of Dr. Land, Dr. Bosholm, and Dr. Pyle, who all noted that Claimant was morbidly obese. (*Id.* at 23-24). As such, the ALJ considered Claimant's obesity in deciding Claimant's RFC and understood that he was required to evaluate Claimant's obesity in light of SSR 02-1p. *See Michael v. Astrue*, No. 1:08-01189, 2010 WL 697000, at *15 (S.D.W.Va. Feb. 24, 2010) (adopting report and recommendation wherein magistrate judge recognized that

references to claimant's obesity in summarizing medical evidence and at step two satisfied SSR 02-1p). Moreover, the ALJ added some limitations to Claimant's RFC that could be attributable to her obesity and potential limitations that could arise from her obesity, including restricting her ability to stoop, crawl, and squat. (Tr. at 21).

Furthermore, Claimant has not pointed to any specific evidence supporting an allegation that her obesity actually causes her additional functional limitations or pain. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3rd Cir. 2005) (declining to remand where ALJ did not consider claimant's obesity because claimant failed to specify how her obesity specifically affected her ability to work other than generally stating that it made it more difficult for her to stand, walk, and use her hands and fingers); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand where ALJ did not explicitly address claimant's obesity, claimant only speculated that his obesity affected his ability to work, and ALJ adopted limitations suggested by reviewing physicians who were aware of claimant's obesity); *Copning v. Colvin*, No. 3:14-cv-00529, Dkt. No. 14 at 56-57 (S.D.W.Va. Jan. 26, 2015) (rejecting argument that ALJ failed to properly consider claimant's obesity where claimant failed to cite evidence supporting allegation that obesity caused additional functional limitations), *report and recommendation adopted by* Dkt. No. 25 (S.D.W.Va. Mar. 30, 2015); *Michael*, 2010 WL 697000, at *15 (adopting report and recommendation wherein magistrate judge rejected claimant's argument that remand was required to consider his obesity when claimant failed to assert how his obesity contributed to his inability to work). While Dr. Bosholm did identify Claimant's morbid obesity as a diagnosis that might affect Claimant's ability to work, Dr. Bosholm did not assess any specific functional limitations in relation to Claimant's obesity. (Tr. at 481). Moreover, Claimant has not precisely asserted how her obesity impacts her work

abilities. Without any evidence or explanation as to how Claimant's obesity affects her ability to work, her argument is unconvincing.

### D. The ALJ's Hypothetical Question to the Vocational Expert

In her fourth challenge to the Commissioner's decision, Claimant asserts that the ALJ relied on flawed vocational expert testimony. (ECF No. 9 at 19). Specifically, Claimant argues that the ALJ failed to include all of her mental restrictions in the RFC finding that made up the controlling hypothetical question posed to the vocational expert. (*Id.* at 19-20). Claimant contends that the ALJ's hypothetical failed to account for her moderate difficulties in concentration, persistence, and pace. (ECF No. 13 at 2). In support of her position, Claimant relies on *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).

In *Mascio*, the ALJ determined at step three that the claimant experienced moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental limitations in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were unskilled, the Fourth Circuit found that this was insufficient to account for the claimant's moderate mental limitations and held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court indicated that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* Because the ALJ failed to either include any mental limitation in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth

47

Circuit found that remand was appropriate. *Id.*

The identical issue was recently addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W.Va. Sept. 30, 2015). There, the ALJ found that the claimant experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *1. Attempting to take this limitation into account, the ALJ restricted the claimant to work involving simple tasks and instructions; however, the Court recognized that this was inadequate under *Mascio*. *Id.* at *4. The Court explained the principle espoused in *Mascio*: "If the ALJ found [the claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* The Court found that remand was appropriate because the ALJ did neither.[8] *Id.* at *5.

This case is comparable to both *Mascio* and *Jackson* in that the ALJ found Claimant experienced moderate difficulties in concentration, persistence, or pace and failed to fully account for those difficulties in the RFC finding. (Tr. at 20). The ALJ attempted to address the limitations by restricting Claimant to work involving simple, routine, and repetitive tasks; however, as the Fourth Circuit explained in *Mascio*, the restriction adopted by the ALJ was insufficient because "the ability to perform simple tasks differs from the ability to stay on task." 780 F.3d at 638. The ALJ also failed to sufficiently explain why additional limitations were not included in the RFC finding given his determination that Claimant labored under these moderate difficulties (presumably

---

[8] The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4.

because the ALJ believed that the limitation to simple and repetitive tasks adequately accounted for the difficulties). Although the ALJ recognized that Mr. Jamison opined Claimant could sustain her attention to complete tasks and that "she did not present any mental health reason that she could not be gainfully employed," (Tr. at 24), once the ALJ found that Claimant experienced moderate difficulties in concentration, persistence, or pace, he was required to include limitations in the RFC finding to account for the impairments, or explain why he declined to do so. The ALJ did neither. Therefore, on remand, the ALJ should reconsider Claimant's mental limitations, and if additional restrictions are not incorporated into the RFC finding, then the ALJ should explain his reasoning for refraining from doing so.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's Motion for Summary Judgment, (ECF No. 8), insofar as it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the

date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** November 13, 2015

Cheryl A. Eifert
United States Magistrate Judge

50